UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ISAAC FORD,

               Plaintiff,

v.                                       Case number 03-75103
                                       Honorable Julian Abele Cook, Jr.

UNIROYAL PENSION BOARD OF
BENEFITS AND AWARDS d/b/a
MICHELIN  RETIREMENT PLAN, ET AL.,

               Defendants.

_____

ORDER

      This case arises out of an earlier action ("*Ford I*"), in which the Plaintiff, Isaac Ford, and three other former employees of Uniroyal, Inc., filed a law suit against the Company's Pension Plan in an effort to recover unpaid disability retirement benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

      Before this Court are (1) the Defendants' motion for judgment on the administrative record; (2) the Defendants' motion for the entry of a partial summary judgment on Counts II, III, and IV of the Complaint; and (3) Ford's motion for a summary judgment.

      For the reasons that are stated below, the Court grants the Defendants' motions and denies Ford's  motion for a summary judgment.[1]

---

[1]Pursuant to E.D. Mich. LR 7.1(e)(2), the Court has decided to resolve these motions on the briefs without the necessity of oral argument by the parties.

I.

Isaac Ford was employed by Uniroyal as a tire builder from August 1967 until the middle of June 1980.  By virtue of his employment with Uniroyal and his membership in the United Rubber Workers Union, he was covered by the Company's Pension Savings and Insurance Agreement ("the Plan").  In 1969, he sustained a herniated disc injury in his spine while working at the Uniroyal plant in Detroit.  After being laid off for an extended  period of time, he was recalled to the plant on July 23, 1980.  Despite having reported for work, he was denied employment because of his medical condition.  Approximately one year later, the Uniroyal Plant closed its business operations (July 22, 1981).

Shortly thereafter, Ford applied for disability pension benefits.  When the Pension Board denied his claim, he joined three former employees in filing a law suit against Uniroyal for its alleged violation of ERISA.  *See Kennedy, et al. v. Uniroyal Pension Plan Board of Benefits and Awards*, E.D. Mich. Case No. 84-74122.  The Court ultimately concluded that the Pension Board's denial of pension benefits to Ford was arbitrary and capricious because the medical evidence disclosed "no material issue of fact as to Ford's permanent and total disability."  (May 29, 1990 Order, at 7.).[2]  As a result, the Court determined that (1) Ford was entitled to receive pension benefits retroactive to June 15, 1980 and (2) Uniroyal was directed to provide him with a disability pension consistent with the terms of the Plan.

Following this directive, Uniroyal disbursed monthly disability pension payments to him

---

[2]*Ford I* was filed on September 5, 1984.  A summary judgment was entered in favor of Ford in 1990.  After multiple appeals, the Sixth Circuit Court of Appeals ("Sixth Circuit") affirmed the decision in favor of Ford on September 4, 1998.

2

in the amount of $352.92.[3]  (AR 00070.).  Ford continued to receive these monthly disbursements until he reached the age of sixty five in October 2001.  On October 20, 2001, these supplemental monthly benefit payments of $160.42 were terminated.

In a letter to Uniroyal on February 4, 2002, Ford voiced his objection to this administrative decision, contending that he was entitled to an increase in his pension payments.  In support of this position, Ford submitted to Uniroyal that he had (1) been recalled to work in July 1980 and (2) accrued service credit under the Plan while on disability retirement pursuant to § 1.3(J) of the Plan.  Four days later, James E. Fivecoat, a member of Michelin's Pension and Investment Plans Division,[4] wrote and advised Ford that his request for an increase in pension benefits had been denied because he never returned to work for Uniroyal after the Detroit facility was closed on July 22, 1980.[5]

Ford appealed this decision to the Pension Board.  However, prior to the commencement of the hearing (March 18, 2003), Ford sought to obtain several items of information which, in his opinion, would assist him in preparing his appellate argument before the Pension Board.[6]  The

---

[3]Under § 1.4(H) of the Plan, Ford received a monthly disability pension allowance which consisted of an initial sum of $160.42 and a supplemental payment of $160.42 that was to be processed until he qualified for Social Security disability benefits or reached the age of 65, at which time Ford would be eligible for other Social Security benefits.  Ford's monthly allowance also included a separate amount of $32.08 for "longevity make-up."  (Def.'s Mot. Administrative Rec. at 6.).

[4]At some point in time, Michelin acquired Uniroyal, Inc.  The corporate entity is now called Michelin North America.  The corporate identity of Ford's employer during any of the relevant times in this controversy is not in dispute.

[5]The date in Fivecoat's letter to Ford is incorrect.  The record in this cause indicates that the plant was closed on July 22, 1981 - not 1980.

[6]Ford requested the following documents:

3

Pension Board responded by providing him with a copy of the 1997 Pension Plan.

During the appellate hearing before the Pension Board on June 17, 2002, Ford maintained that "credited service [should have been given to him] for all years until he turned 65, because he was unable to return from layoff due to his disability." (AR 00008.). It was also his position that this Court had directed the Pension Board on August 23, 1994 to award social security benefits to him once he turned 65. In response, the Board asked the Company's Benefits Department to "determine how many disability pensioners have turned 65 and if any of them had received additional service." (AR 00008.). In response, the Benefits Department advised the Pension Board that no disability retiree had received monthly old age social security benefits upon (1) reaching age 65 or (2) becoming eligible for full Social Security benefits. Shortly thereafter, the Pension Board was advised by the Benefits Department that its research revealed that Ford was neither on layoff status nor had he been recalled from layoff in January 1980. The Pension Board also noted

---

(1) All documents reviewed in making the determination to deny the requested benefits.

(2) All prior determinations of the Plan where an individual sought credited service for time spent on disability following an unsuccessful recall to work or in the alternative any such determination which analyzed for any purpose the impact of Article 3(J) of the Pension Plan.

(3) Any correspondence including memorandum or emails between persons at the company or pension board during the period of Fivecoat's review of Plaintiff's claim.

(4) Any manuals, instruction booklets, advice memos, or prior decisional material upon which Fivecoat relied, or which Fivecoat had available to him in making his determination as to Plaintiff's claim and, in particular, including any material which relates in any way to the application of Article 3(J) and/or question of the granting or denial of credited service to an individual for time during which that individual was receiving, or otherwise eligible for, disability allowance, including under 8©.

Pl.'s Mot. Summ. J., Ex. 7.

that Ford had not been placed on layoff because (1) the Uniroyal plant was closed during this period of time, and (2) during any plant closing and according to the practice and policy of the Company, employees (such as Ford) were terminated or given a voluntary retirement, as opposed to being put on a layoff status. (AR 00004-5.).

On August 27, 2002, Ford's appeal was rejected. In a letter to Ford, George Spencer, the Pension Board Chairman, advised him that the Pension Board had relied upon § 1.4(J) and determined that the Plan

> provides credited service for the time period an employee is on layoff up to the point in time when he is recalled from layoff if that employee is unable to return to work due to a disability. If he is unable to perform the functions of his job or any other job that he can qualify for, he may retire at that time.

(AR 00003.). The Pension Board also determined that § 1.4(J) was inapplicable to Ford "because he was not recalled from layoff. He has been working light duty jobs until the last day his job existed and was terminated at that time." (AR 00003.). Ford requested reconsideration of the decision on November 20, 2002, noting, in part, that the section within the Plan (to wit, § 1.4(J)), upon which the Pension Board had ostensibly relied, did not exist. This request for reconsideration was not answered.

With his administrative remedies having been exhausted, Ford commenced this lawsuit on December 19, 2003 ("*Ford II*"), in which he complained that the Pension Board, Michelin, Fivecoat, and Spencer (collectively, "the Defendants") had (1) arbitrarily and capriciously reduced his monthly pension benefits in violation of ERISA; (2) failed to comply with their respective fiduciary duties to provide him, as an ERISA plan participant, with pertinent information; (3) violated Michigan's "Employee Right to Know Act," Mich. Comp. Laws § 423.502, which prohibits employers from withholding employment records from their employees; and (4) violated

5

orders from this Court which directed the Defendants to provide benefits to him under the terms of the Plan.

III.

This Court will initially address the Defendants' two motions in order to determine if they, individually or collectively, violated the letter or the spirit of ERISA by reducing Ford's monthly benefits.

As a general principle of the law under ERISA, a federal court may review a denial or a reduction of benefits *de novo* "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir.1998) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When a plan administrator has discretionary authority to determine benefits, the court must "review [such] a decision to deny benefits under the highly deferential arbitrary and capricious standard of review." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168–69 (6th Cir. 2003) (internal citations and quotation marks omitted).

In order to resolve the question as to whether the Pension Board has the discretionary authority to determine benefits, the Court will look to the language of the Plan, which reads in pertinent part as follows:

> Article 12. Administration and Allocation of Responsibility.
> . . . .
> (G) The Plan shall be administered by a Board of Benefits and Awards [now known as the Pension Board] . . . . The Board . . . shall have sole responsibility for the interpretation of its provisions and the determination of the right of any person to a benefit, and the decision of such Board with respect to any question arising under this Plan shall be final and binding for all purposes . . . .

(AR 00182.).

6

2:03-cv-75103-JAC-SDP   Doc # 18   Filed 10/19/05   Pg 7 of 22   Pg ID 1151

Contrary to Ford's argument, the language of the Plan confers the discretionary authority upon the Pension Board to determine benefits. In 1989, the Sixth Circuit found clear grants of discretionary authority in other plans that contained similar language. *See*, *e.g.*, *Davis v. Kentucky Fin. Cos. Retirement Plan,* 887 F.2d 689, 694 (6th Cir. 1989) (applying arbitrary and capricious standard of review to plan containing language that plan administrator "shall interpret the Plan and shall determine all questions arising in the administration, interpretation and application of the Plan. All such determinations shall be final, conclusive and binding except to the extent that they are appealed under the . . . claim procedure").

Since Uniroyal had the discretionary authority to determine a participant's eligibility for benefits under the Plan, the Court must apply the arbitrary and capricious standard of review. *McDonald*, 347 F.3d at 168–69. A decision is neither arbitrary nor capricious if it "is rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). This deferential standard "is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis,* 887 F.2d at 693 (internal quotation marks and citation omitted), *cert. denied*, 495 U.S. 905 (1990). This standard requires that the decision "be upheld if it is the result of a deliberate principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of American Health & Retirement Fund*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Under *Wilkins v. Baptist Health Care Sys.*, 150 F.3d 609, 619 (6th Cir. 1998), the Sixth Circuit requires that, when applying the arbitrary and capricious standard, a judicial review of a denial of benefits must be confined to the administrative record. Thus, in conducting its review,

7

this Court must "consider only the factors known to the plan administrator at the time [it] made [its] decision." *Yeager*, 88 F.3d at 381.

In challenging the Defendants' motion, Ford also argues that Uniroyal possesses a conflict of interest because it has been given the right to appoint the Plan's trustees and members of the Board. This argument is without merit. Courts have found that a plan administrator has a conflict of interest when it funds *and* administers a plan governed by ERISA. *See Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457 (6th Cir. 2003); *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 847 n. 4. (6th Cir. 2000) (recognizing potential for self-interested decisionmaking "where, as here, the plan sponsor bears all or most of the risk of paying claims, and also appoints the body designated as the final arbiter of such claims").

In this case, Uniroyal's contributions to the Plan were placed in a trust fund where they are retained "for the exclusive benefit of Employees and their beneficiaries . . . and shall not revert or inure to the benefit of the Company . . ." (AR 00180.). Since there is no evidence that Uniroyal incurs any direct expense as a result of the allowance of benefits or profits directly from the denial of or a reduction in the benefits of an employee, there is no evidence of a conflict of interest issue here. *See, e.g.*, *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (no conflict of interest with separate trustee or provision that fund may be used "for the exclusive benefit of Members under this Plan or for the payment of expenses of the Plan and the Fund").

Guided by these standards, this Court must now address whether the Pension Board's decision to eliminate the supplemental benefit to Ford was arbitrary and capricious. The record indicates that Ford received his monthly pension benefit according to the formula that had been established under § 1.4(H)(b) of the Plan which reads in relevant part:

8

> (b)     If the Disability Insurance Benefit under the Social Security act is denied, the Employee shall receive a benefit equal to the sum of:
>
> (I) the monthly amount determined in accordance with the provisions of this paragraph (H), (a), and
>
> (ii) an additional monthly amount equal to the amount determined in subparagraph (a) above, but in no event shall such additional monthly amount exceed the amount of the Disability Insurance Benefit under Social Security act for which such Employee is eligible.  The additional monthly amount of this sub-paragraph (b) will be payable retroactive to the date of retirement;

(AR 00171.).

Ford received (1) a pension allocation of $160.42; (2) a supplemental income of $160.42; and (3) a "longevity makeup" of $32.08, for a total monthly pension of $352.92.  (AR 00049.). This monthly payment under § 1.4(H) was based on proof of certain conditions, namely, that this supplemental income figure of  $160.42 would be paid only until Ford began to receive Social Security disability benefits or reached the age of 65, whichever occurred first.  Another provision within the Plan (to wit, § 1.4(H)(c) provides, in relevant part, that the "employee, upon attaining 65 or if earlier becomes eligible for a disability insurance benefit under the Social Security Act, shall receive a monthly benefit determined in accordance with the provisions of subparagraph (a) above."  (AR 00171.).

In its pleading papers, the Pension Board maintains that since § 1.4(H)(c) requires that an employee's pension  at the age of 65 years be calculated solely by reference to the formula in § 1.4(H)(a) - and not by reference to the supplemental amount in § 1.4(H)(b).  Hence, it is the Pension Board's contention that Ford is entitled to a single amount of $160.42 plus the longevity makeup, but *without* the supplemental $160.42.

9

Ford advances several arguments to challenge this decision. First, he submits that Spencer's letter of August 27, 2002 cites a provision of the Plan (namely, § 1.4(J)) that does not exist. He says somewhat sardonically that the Pension Board's "[r]eliance on a nonexistent clause, or one written in invisible ink, must be held to be arbitrary and capricious." Pl.'s Br. in Supp. Mot. Summ. J. at 7. While Ford correctly reported that Spencer had cited a nonexistent provision in the Plan, this appears to this Court that it was only a typographical (albeit careless) error by him. However, this mistake does not warrant - standing alone - he reversal of the Pension Board's decision.

It is clear from an examination of the record in its entirety that Spencer intended to cite § 1.3(J) in his letter. The Defendants have noted that Ford, through his attorney, was presumptively aware of this provision in the Plan, inasmuch as he has been involved in this controversy over an extended period of time. Moreover, the letter from Spencer makes reference to the provision for credited service in the Plan, which is clearly implicated by § 1.3(J). Furthermore, Ford cannot argue that the Pension Board improperly relied upon a nonexistent provision because the minutes for the August 23, 2002 Board meeting (which are part of the administrative record) clearly reflect the application of § 1.3(J). (AR 00004.). Thus, Ford's first argument is without merit.

Next, Ford submits that he was entitled to credited service under § 1.3(J), which reads, in relevant part:

> An Employee who, at the time of layoff, had not less than 10 years Credited Service, is recalled or is offered employment pursuant to Article XIV, R (2) or (3) of the Company-Wide Collective Bargaining Agreement and either has attained age 60 or is deemed to be permanently and totally disabled, shall be eligible for a pension under this Article 3, paragraph (c) or paragraph (l) of this part I. Pensions and Credited Service shall be determined as if the Employee had been recalled and rehired on the date of such recall.

10

(AR 00168.).  There is no dispute between the  parties that Ford had accumulated more than ten

years of service to Uniroyal at the time of his injury.  Contending that he was recalled to

employment,[7] Ford claims that, inasmuch as he is qualified for benefits under the conditions in §

1.3(J), he is entitled to credited service "as if [he] had been recalled and rehired on the date of such

recall."  Ford submits that this provision requires that when he turned 65, his pension benefits

should have been *recalculated* as a regular pension with years of credited service for the entire time

period until his 65th birthday following his recall from employment, notwithstanding his rejection

from reinstatement because of his medical condition.[8]  *See* Pl.'s Br. In Supp. Mot. Summ. J. at 6.

The Pension Board offers a much narrower interpretation of § 1.3(J).  In his much

referenced letter, Spencer wrote that upon review of the relevant provision, the Board interpreted

this provision and

> determined that the Plan provides credited service for the time period an employee
> is on layoff up to the point in time when he is recalled from layoff if that employee
> is unable to return to work due to a disability.  If he is unable to perform the
> functions of his job or any other job that he can qualify for, he may retire at that time.

AR 00003.  Whereas Ford interprets this provision as providing credited service for the entire

period of his disability (from 1980 until his 65th birthday), the Board reads it as providing credited

---

[7]The parties vigorously dispute whether Ford was actually recalled to Uniroyal's
employment.

[8]In the letter**,** in which he appealed the reduction of benefits, Ford calculated his benefit
as follows:

> With a start date in 1967 and with Ford turning 65 at the end of October 2001,
> under 3(J) he should have received approximately 34 years of Credited Service
> with that amount of service plugged into the formula of $12.50 x years of service,
> his monthly benefit should be approximately $425, rather than the current
> $160.42 that he is receiving.  (Pl.'s Ex. 7, at 4.)

service *only* for the time that was spent by him on layoff. According to this latter interpretation, Ford, upon being recalled to employment, stopped accruing credited service.

The plain language of § 1.3(J) is sufficiently ambiguous enough to support the interpretations by both parties. Although this provision states that "[p]ensions and Credited Service shall be determined as if the Employee had been recalled and rehired on the date of such recall," it does not specify the method by which this "Credited Service" is calculated. Moreover, it does not offer any guidance upon which to resolve the somewhat unique issue that is presented in this case; namely, when an employee is recalled but does not actually return to work. The Defendants point out that § 1.3(J) is intended to treat those employees who are unable to return to their jobs because of a disability in the same manner as those laid off workers who are able to (1) regain employment, (2) obtain credited service for these layoffs, (3) become disabled, and, thereafter, (4) retire. Moreover, this Section is consistent with other provisions in the Plan; namely, § 1.8(A)(3)**,** which sets forth the relevant provision for credited service in a retirement situation in the following manner:

> The period of Credited Service to be used in determining the eligibility of an Employee for an early retirement allowance, a deferred retirement allowance after separation from service or a disability allowance *shall end with his last day of active service*. The period of Credited Service to be used in determining the eligibility of an Employee for a normal retirement allowance shall end with his 65th birthday. The period of service to be used in computing the amount of a retirement or disability allowance shall be stated in years and months.

(AR 00175 (emphasis added)). In § 1.8(A)(3), the accrual of credited services terminated upon the occurrence of two conditions; namely, when the employee (1) reaches the age of sixty five or (2) retires. In order for § 1.3(J) to be interpreted in a similar manner as § 1.8(A)(3), the accrual of Ford's credited service must have terminated upon his retirement from the Company. Since Ford

12

was on disability retirement as of July 15, 1980, he cannot receive credited service under § 1.3(J), and consequently, is not entitled to a recalculation of his monthly pension benefit.[9]

Ford also argues that the Pension Board erred in determining that he was not on recall when he began to receive disability benefits. This argument is irrelevant. It is significant that Spencer's letter of August 27, 2002 offered two possible explanations for the decision by the Pension Board to eliminate Ford's supplemental allowance. First, the Pension Board noted that Ford was not on recall when he received the pension benefits. The Pension Board also found that even if it accepted Ford's argument that he had been recalled, there is no evidence in the record to support his contention that he is entitled to service credit. Thus, whether Ford is or is not entitled to credited service under § 1.3(J) is the threshold issue. Since he has not satisfied this requirement, any argument regarding his recall is irrelevant for purpose of this motion.[10]

In summary, the Court finds that Ford has not presented sufficient evidence to challenge the Board's interpretation of § 1.3(J) and the resulting reduction in his monthly benefits. In the judgment of the Court, the Board's interpretation of this provision is reasonable and consistent with the remaining provisions of the Plan. Although the plain language of § 1.3(J) may support both parties' interpretations, this Court, which is obligated to apply the arbitrary and capricious standard of review, must give weight to the Pension Board's interpretation. As the Sixth Circuit recently

---

[9]The Board's interpretation of § 1.3(J) is also consistent with § 1.3(I), which addresses those employees who become disabled while working, and receive credited service once they return to work. Like § 1.3(I), the provision under§ 1.3(J) requires that an employee's credited service ceases to accrue once an employee begins his disability retirement or is awarded full social security benefits.

[10]The Court will return to this issue with regard to Count IV of the Complaint, *see infra* Section IV.C.

declared, "[w]e must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by plaintiffs." *Gismondi v. United Technologies Corp.*, 408 F.3d 295, 298 (6th Cir. 2005).

IV.

Turning to the Defendants' second motion for summary judgment, in which they collectively challenge the legal sufficiency of Ford's other three claims, the Supreme Court has held that "[o]ne of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). At the same time, the terms of Rule 56(c) provide that a motion for summary judgment should only be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." The burden is on the moving parties to demonstrate the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In assessing a summary judgment motion, the Court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Fed. R. Civ. P. 56(c); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). It is not the role of the Court to weigh the facts. *See 60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435–36 (6th Cir. 1987). Rather, it is the duty of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Hence, the moving party can show that a genuine

14

factual issue is lacking if it presents evidence sufficient to make the issue "so one-sided that [they] must prevail as a matter of law," *id.* at 252, or point to a failure by the non-moving party to present evidence "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  Upon such a showing, the non-moving party must act affirmatively to avoid entry of a summary judgment.  Fed. R. Civ. P. 56(e).  A mere scintilla of supporting evidence is insufficient.  *See Anderson*, 477 U.S. at 252.

A.

ERISA provides that plan documents must be provided to beneficiaries upon their request. *See* 29 U.S.C. § 1024(b)(4).  According to this provision, the Plan Administrator must produce a copy of the "latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." *Id.*  ERISA also establishes penalties for those plan administrators who fail to respond to reasonable requests for documents, in that they "may be personally liable . . . in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."  29 U.S.C. § 1132(c)(1).

Ford maintains that the Defendants violated their respective fiduciary obligations when they failed to provide him with the  information that he had requested on March 18, 2002. Ford  made another attempt to obtain additional information from the Pension Board several months later on  November 20, 2002, but he was equally unsuccessful in this endeavor as in the past.  However, during the discovery phase in this case, the Pension Board released the administrative record to Ford which contained 256 pages of documents upon which it had relied to evaluate his claim. Ford now asserts that the Defendants purposely withheld these documents from him during his appeal

15

and falsely assured him during his appellate hearing that no new documents had been or would be considered.

In response to this allegation, the Defendants have advanced three arguments: (1) Ford can proceed with this claim only against the Plan Administrator; (2) § 104(b)(4) of ERISA does not require the disclosure of all of the documents that were requested by Ford; and (3) no prejudice was sustained by Ford as the result of his inability to receive the documents that were sought by him. Each of these arguments will be addressed seriatim.

The Defendants correctly note that the Plan Administrator has an obligation to respond to requests for ERISA documents. *See* 29 U.S.C. § 1024(b)(4) ("The administrator shall, upon written request...furnish a copy...."); 29 U.S.C. § 1132(c)(1) (penalties for failure to produce requested documents under ERISA § 1024(b)(4) are assessed against any "administrator."). Since the Pension Board is the only individual or entity who satisfies the definition of a Plan Administrator in this case, Fivecoat and Spencer must be dismissed as parties to this claim.

Turning to the specific documents that were requested by Ford, this Court notes that requests for emails and other correspondence, as well as documents relating to past claimants, are not recognized by courts as instruments which must be turned over to a plan participant under 29 U.S.C. § 1024(b)(4). The Defendants cite a number of decisions, in which courts have rejected claims for similar documents. *See, e.g.*, *Chambless v. Masters, Mates & Pilots Pension Plan*, 571 F.Supp. 1430, 1455–57 (S.D. N.Y. 1983) ("no requirement to produce minutes of trustee's meeting or information about past denials of benefits to other claimants[.]"), *aff'd*, 727 F.2d 1032 (2d Cir. 1985); *Gashlin v. Prudential Ins. Co. of America Retirement System*, 286 F.Supp.2d 407 (D.N.J. 2003) (plan administrator not required to disclose names of similarly situated individuals).

16

Significantly, Ford has neither cited any case law in support of his position nor made any attempt to distinguish those cases that were cited by the Defendants.  Thus, the Court concludes that the Plan Administrator was not obligated under ERISA to provide Ford with emails or documents relating to past claimants. At the same time, this Court finds that some of the documents that were sought by Ford were relevant to his claim and should have been provided by the Plan Administrator.  Certainly, the first and fourth categories of the requested documents qualify as "other instruments under which the plan is established or operated."  29 U.S.C. § 1024(b)(4).

Thus, the dispositive question for this issue is whether Ford suffered any prejudice which was caused by the Pension Board's delay in furnishing documents relating to his claim for benefits. In deciding whether to impose a penalty under 29 U.S.C. § 1132(c)(1), courts are advised to determine if the plaintiff beneficiary was prejudiced as a result of the Plan Administrator's delay in producing the plan documents.  *See, e.g.*, *Gatlin v. Nat. Healthcare Corp.*, 16 Fed.Appx. 283, 289 (6th Cir. Mar. 2, 2001) (unpublished) ("prejudice to the beneficiary is a logical concern for in deciding whether to impose a penalty" under § 1132(c)(1) for failure to provide documents.); *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068 (6th Cir. 1994) ("[m]any courts have refused to impose a penalty under § 1132(c)(1)(B) in the absence of a showing of prejudice or bad faith.")**.**

Here, Ford has failed to identify any cognizable prejudice as a result of the Defendants' failure to provide him with documents relating to his claim.  It is contended by Ford that because of the Defendants' failure to provide him with the requested documents, he was "denied substantive due process in attempting to argue and appear before the Board where the Plaintiff did not have access to the documents relied on by the Board's staff in denying benefits."  Pl.'s Resp. Br. to Def.'s Mot. Summ. J. at 4.  However, a review by this Court of the specific documents that were

17

relied upon by the Pension Board during its evaluation of Ford's claim reveals that he had received many of the documents prior to his appeal. For example, some of the documents relate to *Ford I*, such as the documentation relating to the calculation of pension payments in compliance with a previously entered order from this Court, or his own deposition transcript. (AR 00017-37, 54-59, 72-75, 77-82, 85-90). The administrative record also contains correspondence that was exchanged between Ford (through his counsel) and some or all of the Defendants in this cause. (AR 00001-00003, 156-160). Other documents, including Ford's claim for disability, were already in his possession. None of these documents have any apparent bearing on the Pension Board's interpretation of § 1.3(J), the critical issue in this case.

Accordingly, this Court finds that Ford has not identified any specific prejudice which was caused by the Pension Board's failure or delay in producing documents relating to his claim for disability. In the absence of any showing of prejudice, the Court rejects Ford's claim that the Defendants violated their fiduciary duties of disclosure.

### B.

The "Bullard Plawecki Act," Mich. Comp. Laws 423.502, provides, in relevant part:

> Information that was not—but should have been (as required by law)—included in the personnel record shall not be used by an employer in a judicial or quasi-judicial proceeding. However, personnel record information which, in the opinion of the judge in a judicial proceeding or in the view of a hearing officer in a quasi-judicial proceeding, was not intentionally excluded in the personnel record, may be used by the employer in the judicial or quasi-judicial proceeding, if the employee agrees or if the employee has been given a reasonable time to review the information. Material which should have been included in the personnel record shall be used at the request of the employee.

In his pursuit of this issue, Ford attempts to avoid the broad preemptive sweep of ERISA by

18

making distinctions between the Company and the Plan.  He takes the position that it is the employer who was responsible for providing employee records and, as a consequence, it must be assessed penalties according to the law in Michigan.  The Court disagrees.  The purpose of Ford's document request was to challenge the decision by the Plan Administrator to reduce his award of pension benefits.  Clearly, he was seeking to obtain documents relating to an ERISA plan.  Notwithstanding this argument, his request for relief under this state statute has been preempted.  In 1990, the Supreme Court declared in *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990):  "Under this 'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be preempted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."

ERISA contains an express preemption clause which states that a federal statute "shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan." 29 U.S.C. § 1144(a).  The Supreme Court has interpreted this clause as preempting any state law claim that would allow an employee benefit plan beneficiaries to "obtain remedies under state law that Congress rejected in ERISA."  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987).  This interpretation reflects the intent of Congress "that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits." *Id.* at 52.  The Sixth Circuit has "recognized the broad sweep of [ERISA's] preemption provision in relation to state law claims based upon an improper denial of benefits, noting that 'virtually all state law claims relating to an employee benefit plan are preempted by ERISA.'"  *Ramsey v. Formica Corp.*, 398 F.3d 421, 424 (6th Cir. 2005) (citing *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir.1991)).

19

Based on its review of the relevant case law, the Court concludes that Ford's claim, which is based on the language of the law in Michigan, is preempted by ERISA. Significantly, Ford has already asserted an ERISA claim against the Defendants for their alleged failure to disclose certain material documents. Inasmuch as Ford seeks to obtain a remedy under this state statute that Congress rejected in ERISA, this Court must find that this claim is preempted. *Pilot Life*, 481 U.S. at 54. Accordingly, this claim must fail.

C.

Finally, the attention of this Court must now turn to Ford's allegation that the Defendants have violated the directives of this Court in *Ford I*. Specifically, he submits that the Defendants' actions contradict the plain language of an Order of August 23, 1994, which determined that Ford was entitled to receive his payment of a pension on a monthly basis. This argument is without merit. In its Order, the Court directed the Pension Plan to

> continue the payment of monthly pensions to the Plaintiffs, together with all fringe benefits up to the age of 65, at which time, it shall provide each Plaintiff with such additional ongoing payment and fringe benefits that may be required under the pension plan.

(August 23, 1994 Order at 2.).

The plain language of this directive only directs the Pension Board to award such benefits as "may be required under the pension plan." As noted above, the Pension Board's decision to eliminate the supplemental benefit once Ford reached 65 years old was neither arbitrary nor capricious. Similarly, the Board's determination that Ford was not entitled to credited service under § 1.3(J) was reasonable and consistent with other provisions of the Plan. Thus, the Court finds that the Pension Board did not violate any of its directives.

20

Ford also points out that in *Ford I*, the former Plan Administrator was sanctioned for what the Court determined to be "a pattern of bad faith." (Order of May 29, 1990 at 12). Presumably, Ford cites this language to show that the Defendants are continuing to engage in bad faith by denying benefits to him. Even though this Court did make that determination during the initial lawsuit, it will not sanction the Defendants in the absence of any specific showing of bad faith.

Finally, Ford asserts that the Board's conclusion that he was not recalled from layoff runs counter to an earlier determination by this Court. This Court does not read its earlier directives in the same manner as Ford. In its Order of May 29, 1990, the Court stated:

> In support of its claim for summary judgment, Ford makes essentially three arguments. First, Ford argues that there is no factual dispute regarding his medical condition when he applied for his disability pension. Ford was laid off from his position with Uniroyal in June of 1980. He was subsequently recalled to work, but was denied employment because of physical disability. In August of 1981, Ford applied for a disability pension, which was subsequently denied by the Defendant.

The Court reads this Order as acknowledging Ford's argument regarding his recall, and not as a factual finding that he was, in fact, recalled. In any event, this argument is not germane to the issues in this case. The Pension Board's ultimate determination that Ford was not entitled to the supplemental benefit was a result of its view that § 1.3(J) did not apply to his case, even if he was on recall.

Accordingly, the Court finds that the Defendants have neither violated the spirit nor the letter of its previous Orders. Thus, this claim must be denied.

V.

For the reasons that were stated above, the Court (1) grants the Defendants' motion for

judgment on the administrative record; (2) grants the Defendants' motion for partial summary

judgment on Counts II, III, and IV; and (3) rejects Ford's motion for summary judgment.  As a

result, this case is dismissed with prejudice.

      IT IS SO ORDERED.


DATED:     October 19, 2005               s/ Julian Abele Cook, Jr.

            Detroit, Michigan             JULIAN ABELE COOK, JR.

                             United States District Judge


Certificate of Service

I hereby certify that on October 19, 2005,  I electronically filed the foregoing with the Clerk of
the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF
participant(s).

                                    s/ Kay Alford
                                    Courtroom Deputy Clerk